**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ALEXSAM, INC, <br>    *Plaintiff* | § <br> § <br> § | |
| v. | § <br> § <br> § | |
| SIMON PROPERTY GROUP, L.P., BLACKHAWK NETWORK, INC., AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., and U.S. BANK, N.A. <br>    *Defendants* | § <br> § <br> § <br> § <br> § <br> § <br> § | |
| _____ | § | CASE NO. 2:19-CV-331-JRG |
| ALEXSAM, INC., <br>    *Third-Party Plaintiff* | § <br> § <br> § | |
| v. | § <br> § <br> § | |
| BLACKHAWK NETWORK, INC., U.S. BANK, N.A., AMERICAN EXPRESS TRAVEL RELETED SERVICES COMPANY, INC. <br>    *Third-Party Defendants* | § <br> § <br> § <br> § <br> § <br> § | |

**CLAIM CONSTRUCTION
MEMORANDUM AND ORDER**

On June 24, 2021, the Court held a hearing to determine the proper construction of disputed terms in United States Patent No. 6,000,608.  Before the Court is the Opening Claim Construction Brief (Dkt. No. 212) filed by Plaintiff Alexsam, Inc. ("Plaintiff" or "AlexSam" or "Alexsam").  Also before the Court are: the Responsive Claim Construction Brief (Dkt. No. 223) filed by Defendant Simon Property Group, L.P. ("Simon" or "SPG"); the Responsive Claim Construction Brief (Dkt. 222) filed by Defendants American Express Travel Related Services Company, Inc. ("Amex"), Blackhawk Network, Inc. ("Blackhawk"), and U.S. Bank N.A. ("U.S.

1

Bank") (collectively referred to as the "Third-Party Defendants"); and Plaintiff's reply (Dkt. No. 228).   Further before the Court are the parties' joint claim construction charts filed pursuant to Local Patent Rule ("P.R.") 4-3 (Dkt. No. 202) and P.R. 4-5(d) (Dkt. No. 232, Ex. A).   Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order.   *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I.  BACKGROUND** ................................................................................................................ **4**

**II.  LEGAL PRINCIPLES** ..................................................................................................... **6**

**III.  AGREED TERMS** ............................................................................................................ **10**

**IV.  DISPUTED TERMS** ......................................................................................................... **10**

    1.  "banking network" ...................................................................................................... 11

    2.  "loyalty data" ............................................................................................................... 18

    3.  "prepaid card" .............................................................................................................. 24

    4.  "processing hub" .......................................................................................................... 27

    5.  "transaction processor" ............................................................................................... 33

    6.  Mixed Method-Apparatus ........................................................................................... 41

**V.  CONCLUSION** ................................................................................................................. **46**

**APPENDIX A** ......................................................................................................................... **47**

# I. BACKGROUND

Plaintiff alleges infringement of United States Patent No. 6,000,608 ("the '608 Patent").

Dkt. No. 212 at Ex. A.  Plaintiff submits that "[t]he '608 Patent covers a variety of important

technologies relating to the debit card industry," and "[t]he multifunction card system disclosed

in the '608 Patent enabled consumers and retailers to use existing point-of-sales devices, the

existing banking infrastructure, and a bank identification number (BIN) to perform financial

transactions . . . ."  Dkt. No. 212 at 1.

The '608 Patent, titled "Multifunction Card System," issued on December 14, 1999, and

bears a filing date of July 10, 1997.  The Abstract of the '608 Patent states:

> Disclosed is a multifunction card system which provides a multifunction card
> capable of serving as a prepaid phone card, a debit card, a loyalty card, and a
> medical information card.  Each card has an identification number comprising a
> bank identification number which assists in establishing communications links.
> The card system can be accessed from any existing point-of-sale (POS) device.
> The POS device treats the card as a credit or debit card and routes transaction data
> to a processing hub using the banking system.  The processing hub coordinates
> the various databases corresponding to the various functions of the card.

Various courts, including this Court, have construed disputed terms in the '608 Patent:

> *Alexsam, Inc. v. Datastream Card Services, Ltd., et al.*, No. 2:03-CV-337, Dkt.
> No. 199 (E.D. Tex. June 10, 2005) (Ward, J.) ("*Datastream*") (attached to
> Plaintiff's opening brief (Dkt. No. 212) as pages 2–21 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. Humana Inc.*, No. 2:07-CV-288, Dkt. No. 114 (E.D. Tex.
> Aug. 28, 2009) (Ward, J.) ("*Humana*") (attached to Plaintiff's opening brief (Dkt.
> No. 212) as pages 22–38 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. UnitedHealth Group Inc., et al.*, No. 2:07-CV-512, Dkt. No. 102
> (E.D. Tex. Dec. 2, 2010) (Everingham, J.) ("*UnitedHealth*") (attached to
> Plaintiff's opening brief (Dkt. No. 212) as pages 39–41 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. IDT Corp.*, No. 2:07-CV-420, Dkt. No. 105 (E.D. Tex. June 29,
> 2010) (Ward, J.) ("*IDT*") (attached to Plaintiff's opening brief (Dkt. No. 212) as
> pages 42–60 of 183 of Exhibit E);

*Alexsam, Inc. v. Pier 1 Imports, Inc.*, No. 2:08-CV-15 (E.D. Tex. Aug. 17, 2011) (Everingham, J.) ("*Pier 1*") (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 61–63 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 180 (E.D. Tex. Apr. 9, 2012) (Craven, J.) ("*Best Buy*") (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 64–103 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 331 (E.D. Tex. Nov. 14, 2012) (Schneider, J.) (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 104–115 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 112 (C.D. Cal. June 14, 2016) (Snyder, J.) ("*Green Dot*") (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 116–141 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 124 (C.D. Cal. Sept. 12, 2016) (Snyder, J.) (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 142–145 of 183 of Exhibit E);

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 186 (E.D.N.Y. June 11, 2018) (Gold, J.) ("*MasterCard*") (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 146–166 of 183 of Exhibit E);

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 237 (E.D.N.Y. June 17, 2020) (Glasser, J.) (attached to Plaintiff's opening brief (Dkt. No. 212) as pages 167–183 of 183 of Exhibit E); and

*Alexsam, Inc. v. Cigna Corp., et al.*, No. 2:20-CV-81 (Lead Case), -82 (Consolidated Case), Dkt. No. 71 (E.D. Tex. April 20, 2021) (Payne, J.) ("*Cigna*") (attached to Plaintiff's opening brief as Exhibit B).

Plaintiff has also discussed another case regarding the patent-in-suit that is pending in the

District of Utah. *See Alexsam, Inc. v. HealthEquity, Inc.*, 477 F. Supp. 3d 1227 (D. Utah 2020)

(Nielson, J.) (denying a motion to dismiss based on 35 U.S.C. § 101).[1]

---

[1] The Utah court found individual components such as a "processing hub" were not inventive, but "[t]he court finds it plausible that, even if each element of the claims was itself conventional, the ordered combination and specific arrangement of these conventional pieces described by claims was 'non-conventional and non-generic' at the time of invention." 477 F. Supp. 3d at 1234. The Utah court therefore denied the 35 U.S.C. § 101 motion to dismiss. The defendant attempted an interlocutory appeal, which the Federal Circuit denied. *See* 825 F. App'x 927 (Fed. Cir. 2020). The Utah district court case remains pending. *See* No. 2:19-CV-00445 (D. Utah.)

Plaintiff asserts each of the following claims of the '608 Patent against one or more Defendants in the present case (independent claims bolded): Claims **34**, 35–39, 44, 45, **60**, 61–63, 65, and 66.

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.  Those preliminary constructions are noted below within the discussion for each term.

## II.  LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period."  *Teva*, 135 S. Ct. at 841 (citation omitted).  "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.  These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal."  *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,

262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id.*  Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack

sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court.  *Id.*  Generally, extrinsic

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because

of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

### III.  AGREED TERMS

The parties reached agreement on constructions as stated in their April 30, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-3 (Dkt. No. 202 at 3–4) and their June 11, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-5(d) (Dkt. No. 232, Ex. A at A-8–A-12).   Those agreements are set forth in Appendix A to the present Claim Construction Memorandum and Order.

### IV.  DISPUTED TERMS

The parties, in their respective briefing, organize the disputed terms slightly differently. Rather than attempt to divine an ideal ordering and arrangement of the disputed terms, the Court uses the numbering of disputed terms set forth in Plaintiff's opening brief.  Also, Plaintiff points to varying statements regarding the level of skill of a person of ordinary skill in the art.  *See* Dkt. No. 212 at 6–7; *see also* Dkt. No. 223 at 3.  Any apparent disagreement in this regard does not affect the Court's claim construction analysis and is therefore not further addressed herein.

## 1. "banking network"

| Plaintiff's Proposal | Defendant SPG | Third Party Defendants AmEx, Blackhawk, U.S. Bank |
|---|---|---|
| A set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions, and which utilizes a processing hub; Not indefinite | This claim element is indefinite under § 112 because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.<br><br>To the extent that it can be understood:<br><br>A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which *incorporates* and utilizes a processing hub | A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which *incorporates* and utilizes a processing hub |

Dkt. No. 202, Ex. A at 1; Dkt. No. 212 at 11 (emphasis added); Dkt. No. 222 at 8 (emphasis added); Dkt. No. 232, Ex. A at A-1.  The parties submit that this term appears in Claims **34**, 44, **60**, and 63.  Dkt. No. 202, Ex. A at 1; Dkt. No. 232, Ex. A at A-1 (independent claims bolded).

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which utilizes a processing hub."

(a)  The Parties' Positions

Plaintiff argues that "the context of the claims provides clarity for the 'banking network' element."  Dkt. No. 212 at 12.  Plaintiff also submits that "the specification uses 'banking network' to encompass all of the networks that interface with retail POS devices for the purpose of routing financial card transactions to a card processing hub."  *Id.* at 13.  Plaintiff proposes that the Court adopt the *Cigna* construction.  *Id.*

SPG responds that this claim term is unclear because "a POSITA would understand that the banking network, or rather each type of banking network, would need to be modified and would require a different solution for handling the multifunction cards."  Dkt. No. 223 at 17. SPG likewise argues that persons of skill in the art "would not know with any certainty what the 'banking network' includes, whether it includes modifications, or how non-standard cards and functions may be used and performed on it."  *Id.* at 18.

The Third Party Defendants respond that "Defendants' construction includes this 'incorporates' phrase, maintaining the same construction that has been adopted for this claim term in many other cases in which it was contested."  Dkt. No. 222 at 8.  The Third-Party Defendants also submit that "neither side in the *Cigna* case proposed including the word 'incorporates,' and the parties [in *Cigna*] substantially agreed upon the term's construction during the *Markman* hearing."  *Id.* at 9.  The Third Party Defendants argue that, during prosecution, "Applicant expressly defined the characteristics of the claimed 'banking network' via amendment."  *Id.* at 10.

Plaintiff replies that "SPG mischaracterizes the purpose of the banking network and 'unique identification number' with respect to the Processing Hub and transaction processor," and "[a]ny attempt by SPG to construe 'banking network' in a vacuum divorced from the other elements of the claim, such as the transaction processor and Processing Hub, is improper."  Dkt. No. 228 at 5 (citations omitted).  Plaintiff also argues that "[d]espite SPG's allegations otherwise, there are not different types of banking networks."  *Id.*  Instead, Plaintiff argues, "[t]here is only one banking network, and a POSITA would understand what the term 'banking network' encompassed."  *Id.* (citations omitted).  Plaintiff submits: "Simply put, there are no modifications to the banking network other than what is explicitly identified in the specification,

which is the addition of a Processing Hub on the banking network and the modification of existing transaction processors to route multifunction card transactions on the banking network to a Processing Hub using the BIN." *Id.* at 6.  Finally, Plaintiff argues: "SPG and the Third-Party Defendants' proposed inclusion of the phrase 'incorporates and' is redundant.  The processing hub can only utilize the banking network if it is incorporated in some manner." *Id.* at 7.

At the June 24, 2021 hearing, Plaintiff agreed with the Court's preliminary construction, and Plaintiff reiterated that the banking network is not novel.  Rather, Plaintiff argued, the existing banking network is being used in a novel way.  SPG reiterated its arguments that the term is unclear.  Defendants also maintained their arguments that the banking network "incorporates" a processing hub.  The Third Party Defendants urged that the banking network must include *some* processing hub, even if it is not the same processing hub recited in the claims.

(b)  Analysis

Claims 34 and 44, for example, recite (emphasis added):

34.  A system comprising:
a.  at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;
b.  a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;
c.  a processing hub receiving directly or indirectly said activation data from said transaction processor; and
d.  said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

\* \* \*

44.  The system of claim 34, wherein the transaction processor is coupled to the banking network.

In *Cigna*, the Court construed "banking network" to mean "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which utilizes a processing hub." *Cigna* at 39–42.

The specification discloses:

The system 108 comprises a plurality of cards 101, a sponsor bank processor 102, and a processing hub 103, which serves as the nerve center of the system 108. . . . In order to achieve the desired functionality, the system 108 uses *existing banking networks* in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105. * * *

To access these POS devices, the operator of the system 108 must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association.  The BIN serves as a unique identifier of the multifunction card system 108 within the banking network. * * *

* * * By using one of these numbers, the card 101 will be recognized by almost all existing POS devices 105 as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination.  This occurs regardless of the type of POS device 105 used, since all such devices are designed to interface with the *banking network*.

'608 Patent at 4:20–67 (emphasis added); *see id.* at Fig. 2.

As the parties in *Cigna* substantially agreed at the April 14, 2021 hearing in *Cigna*, the "processing hub" in Claim 32 is not part of a conventional banking network but rather operates *in conjunction with* such a banking network.  *Cigna* at 41.  For this reason, *Cigna* adopted the *Datastream* construction but omitted the word "incorporates."  *Id.*

SPG argues that the patentee created confusion during prosecution as to whether and how an existing banking network would be modified according to the claimed invention. SPG submits:

The applicant added the reference to the banking network to each claim during prosecution to overcome prior art.  The applicant added that the unique identification number of the cards comprise a "[BIN] approved by the American [Bankers] Association for use in a banking network" since the prior art allegedly

> could not "function in an existing banking network" as it "lack[ed] the critical feature of the [BIN] . . . which permits access to the banking network." (Ex. 1[, June 24, 1999 Amendment] at ALEXSM0000138–140.)  The applicant went on to state that the "present invention . . . claims, the unique advantage of providing a system which can be used flexibly with a variety of different encoded cards that include . . . a [BIN] . . . [that] allow[s] the existing [POS] system . . . and the existing banking network and existing bank processing hubs, to be used to activate or recharge phone cards, electronic gift certificates and other types and functionality described and claimed." (*Id.* at ALEXSM0000140.)

Dkt. No. 223 at 16–17; *see id.*, Ex. 1, June 24, 1999 Amendment at 11 (ALEXSM0000139) (stating that a "banking network" "necessarily, by virtue of its being a banking network, incorporates and utilizes a bank processing hub").

On balance, SPG does not persuasively show that the above-cited prosecution history gives rise to any "confusion created by the patentee about its claim scope." *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344 (Fed. Cir. 2015).  Further, the cited prosecution history does not set forth a lexicography.  Instead, the patentee simply characterized the claimed invention as serving to augment the existing banking network.  *See* Dkt. No. 223, Ex. 1, June 24, 1999 Amendment at 10–12 (ALEXSM0000138–40).  The additional authorities cited by SPG do not compel otherwise.  *See MONKEYmedia, Inc. v. Apple, Inc.*, No. A-10-CA-319-SS, 2015 WL 4758489, at *13 (W.D. Tex. Aug. 11, 2015); *see also Virtual Sols., LLC v. Microsoft Corp.*, 925 F. Supp. 2d 550, 562–70 (S.D.N.Y. Feb. 15, 2013), *aff'd*, 540 F. App'x 997 (Fed. Cir. 2013) (claim indefinite because "one of ordinary skill in the art would view it as critical to know the relationship between [two limitations]," which were used in contradictory ways, "and because the [patent] fails to disclose this relationship").[2]

---

[2] Also, the deposition testimony of Plaintiff's expert cited by SPG does not give rise to any indefiniteness.  *See* Dkt. No. 223, Ex. 3, May 27, 2021 Zatkovich dep. at 50:15–55:1, 57:23–58:13 & 73:3–5.

Moreover, Plaintiff reaffirms in the present case that "there are no modifications to the banking network other than what is explicitly identified in the specification, which is the addition of a Processing Hub on the banking network and the modification of existing transaction processors to route multifunction card transactions on the banking network to a Processing Hub using the BIN."  Dkt. No. 228 at 6 (footnote omitted); *see* '608 Patent at 4:33–35 ("the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105"); *see also* Dkt. No. 212, Ex. D, Sept. 18, 2020 Zatkovich Decl. at ¶ 24 ("[T]he invention does not indicate that the mere addition of an ABA approved BIN on the cards would allow the existing banking network to perform those functions. That is the purpose of the transaction processors and the Processing Hub.") (internal quotation marks omitted) & ¶ 29 ("one of the features of the invention is that the banking network itself is not modified").

Finally, although SPG's arguments regarding sufficiency of disclosure (*see, e.g.,* Dkt. No. 223 at 19) may perhaps bear upon other issues, such as enablement or written description, SPG's arguments do not demonstrate indefiniteness.

As to the proper construction in light of the arguments submitted here, Defendants do not sufficiently justify adding the word "incorporates" to the *Cigna* construction, and Defendants' proposal might give rise to additional disputes regarding the nature or degree of incorporation. The opinions of Plaintiff's expert regarding "incorporate," cited hereby Defendants, are taken out of context by Defendants and do not justify departing from the *Cigna* construction.  *See* Dkt. No. 212, Ex. D, Sept. 18, 2020 Zatkovich Decl. at ¶ 29[3]; *see also* Dkt. No. 223, Ex. 3, May 27,

---

[3] Plaintiff's expert opines (Dkt. No. 212, Ex. D, Sept. 18, 2020 Zatkovich Decl. at ¶ 29):

> [SPG's expert] further implies that the banking network would have to be altered in some fashion and therefore needs a modified definition over and above the

2021 Zatkovich dep. at 48:4–6 ("The banking network clearly does incorporate a processing hub for the use of multifunction cards, but by defining the term 'banking network' in and of itself, a banking network exists without a processing hub being placed on the banking network.").  The construction should therefore again set forth that a processing hub is utilized by a banking network, as the claimed inventions are directed to this interaction and to this enhancement of the existing banking network.[4]

Any remaining dispute regarding whether a particular composition of network elements meets the "banking network" limitation is a question of fact for the finder of fact rather than a question of law for claim construction.  *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

---

existing standard banking network.  However, one of the features of the invention is that the banking network itself is not modified and therefore does not explicitly require any further caveats such as "incorporates and uses utilizes [*sic*] a processing hub".  As far as the banking network is concerned all the components of this invention are transparent to the network.  In other words, the transaction processor and Processing Hub follow the same rules as any other transaction routing or processing component on banking network.

[4] Moreover, Defendants have not clearly explained any meaning of "incorporates" that is different from "utilizes," so including "incorporates" in the construction would add confusion without any discernible clarifying effect.

The Court accordingly hereby construes **"banking network"** to mean **"a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which utilizes a processing hub."**

**2. "loyalty data"**

| Plaintiff's Proposal | Defendant SPG | Third Party Defendants AmEx, Blackhawk, U.S. Bank |
|---|---|---|
| No construction necessary; not indefinite[5] | This claim element is indefinite under § 112 because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. To the extent that it can be understood: Data transmitted when a loyalty card is swiped through an unmodified existing standard retail point-of-sale device, comprising the unique identification number of the loyalty card and purchase data representing the goods and services purchase amount and allowing for crediting the corresponding account with loyalty points based upon the purchase data | Blackhawk and U.S. Bank: No construction necessary. AmEx: No position taken as "loyalty data" is not present in any of the claims asserted against Amex. |

Dkt. No. 202, Ex. A at 2; Dkt. No. 222 at 10; Dkt. No. 232, Ex. A at A-2. The parties submit that this term appears in Claims 45 and 66. Dkt. No. 202, Ex. A at 2; Dkt. No. 232, Ex. A at A-2.

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "data associated with card usage."

---

[5] Plaintiff previously proposed: "Data transmitted when a loyalty card is swiped through an [unmodified existing]/[pre-existing] standard retail point-of-sale device, comprising the unique identification number of the loyalty card and purchase data representing the goods and services purchase amount; Not indefinite." Dkt. No. 202, Ex. A at 2; Dkt. No. 212 at 13.

(a)  The Parties' Positions

Plaintiff argues that "[a] POSITA [(person of ordinary skill in the art)] would understand that this loyalty data is associated with the user's card based on the unique identification number, and the card's usage would generate the purchase data."  Dkt. No. 212 at 14 (citation omitted). Plaintiff proposes the *Green Dot* construction, arguing that *Green Dot* already considered arguments similar to those presented by SPG in the present case.  *See id.* at 15–16.  Finally, Plaintiff argues that "SPG seeks to limit 'loyalty data' to a preferred embodiment from the specification," and "the construction proposed by SPG and [its expert] is contrary to what one of ordinary skill in the art would have understood at the time . . . ."  *Id.* at 16–17 (citations omitted).

SPG responds:

> Like with "banking network," a POSITA would not know with reasonable certainty what the term "loyalty data" means in view of the inherent contradictions surrounding its use among the claims.  In claims 12 and 20 "loyalty data" is defined as "comprising the unique identification number of the card and purchase" amount or data sent from a POS device.  Substituting that definition into claims 45 and 66 renders them nonsensical.

Dkt. No. 223 at 21 (citing Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 53).  SPG submits that "the patent describes and claims 'loyalty data' in inconsistent and irreconcilable ways as something associated with a card based on card usage (claims 45 and 66), the card unique identification number and purchase amount (claims 12 and 20), and loyalty credit or points (9:62–10:1)."  Dkt. No. 223 at 23 (citing '608 Patent).

Blackhawk and U.S. Bank respond that "[n]ot every term requires a construction, and here what the patentee intended to cover by the claims is apparent from the context of the claims themselves."  Dkt. No. 222 at 11.  Blackhawk and U.S. Bank argue that "AlexSam and SPG both seek to introduce constructions of 'loyalty data' that on their face are not applicable to either

claim 45 or claim 66," and "the *Green Dot* construction for 'loyalty data' does not appear to be applicable to claims that do not already include a 'loyalty card.'"  *Id.* at 11 & 13.

Plaintiff replies that "SPG is improperly importing other claim limitations into the construction of 'loyalty data' that are not necessary, but are a requirement for associating the 'loyalty data' (which is a separate limitation in those claim elements)."  Dkt. No. 228 at 7–8 (citations omitted).  Plaintiff also argues that "SPG's inclusion of 'loyalty points' into their proposed construction of 'loyalty data' conflicts with the plain language of the specification and only injects further confusion as [to] what loyalty data is when SPG's proposed construction of 'loyalty data' is inserted into the claim language of Claim 45 and 66."  *Id.* at 8 (footnote omitted).

At the June 24, 2021 hearing, Plaintiff, Blackhawk, and U.S. Bank were amenable to the Court's preliminary construction.  SPG maintained that if the Court does not find the term indefinite, crediting an account is an important aspect of loyalty data.

(b)  Analysis

The Summary of the Invention states:

> *In a preferred embodiment*, the multifunction card system further comprises at least one loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving loyalty data from an existing standard retail point-of-sale device when the loyalty card is swiped through the point-of-sale device, the *loyalty data comprising the unique identification number of the loyalty card and a purchase amount*; and means for *crediting an account corresponding to the loyalty card* with a number of loyalty points proportional to the purchase amount.

'608 Patent at 3:42–53 (emphasis added).

The patentee did not thereby set forth a definition of "loyalty data."  Instead, this is a disclosure of what loyalty data comprises in a particular embodiment.  *See id.*

20

SPG argues that "[i]n claims 12 and 20, 'loyalty data' is defined as 'comprising the unique identification number of the card and purchase' amount or data sent from a POS device," and "[s]ubstituting that definition into claims 45 and 66 renders them nonsensical." Dkt. No. 223 at 21 (citing *id.*, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 53). For example, dependent Claim 12 includes "means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the loyalty card and purchase data." Dependent Claim 20 includes a similar limitation.

But Claims 12 and 20 merely recite limitations as to what the loyalty data "compris[es]" in those claims. SPG does not show how this purportedly amounts to a definition applicable to all claims.

SPG also argues that "[t]he specification only makes matters worse as it appears to use 'loyalty data' interchangeably with 'loyalty points'" (Dkt. No. 223 at 22), but the cited portion of the specification is consistent with "loyalty data" and "loyalty points" being distinct from one another:

> [T]he *loyalty data* could be used to simultaneously credit other databases of the system 108. For instance, instead of awarding *loyalty points*, the system could add value in real time to a record in the phone database 204 at the prepaid phone card issuer hub 104, thus rewarding the customer with free phone time. *Loyalty points* might also be converted into a dollar value for use at the retail location.

'608 Patent at 9:62–10:1 (emphasis added); *see id.* at 5:9–12 ("By providing a means for any given POS device 105 to connect to the processing hub 103, the system 108 allows a retailer to remotely activate or add value or loyalty data to a system card."); *see also id.* at 9:26–61. Also of note, *Green Dot* construed "loyalty points" to mean "a unit of measurement earned from or relating to a loyalty card program." *Green Dot* at 18–21.

21

On balance, SPG fails to demonstrate any internal inconsistency or any purportedly nonsensical claim language.  The authorities cited by SPG, regarding indefiniteness arising from nonsensical claim language or inconsistent descriptions of the claimed invention, are therefore unpersuasive.  *See Virtual Solutions, LLC v. Microsoft Corp.*, 925 F. Supp. 2d 550, 563 (S.D.N.Y. 2013); *see also In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) ("even if it were possible to harmonize all of [the patent applicant's] statements, it is not enough 'that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*'") (quoting *Nautilus*, 134 S. Ct. at 2130).  The opinions of SPG's expert are likewise unpersuasive.  *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶¶ 52–58.

*Green Dot* construed "loyalty data" to mean "data transmitted when a loyalty card is swiped through an [unmodified existing]/[pre-existing] standard retail point-of-sale device, comprising the unique identification number of the loyalty card and purchase data representing the goods and services purchase amount."  *Green Dot* at 15–18.

As to SPG's proposal to require "allowing for crediting the corresponding account with loyalty points based upon the purchase data," the claims here at issue already refer to usage of the card.  Claims 45 and 66 recite (emphasis added):

> 45.  The system of claim 34, wherein the processing hub associates *loyalty data* with the electronic gift certificate card *based upon the usage of the electronic gift certificate card*.
>
> * * *
>
> 66.  The method of claim 60, further comprising associating *loyalty data* with the card *based upon usage of the card*.

SPG also cites a portion of the Summary of the Invention that refers to "crediting an account corresponding to the loyalty card with a number of loyalty points proportional to the

22

purchase amount," but this disclosure (reproduced above) pertains to specific features of a particular embodiment rather than necessarily the claimed invention as a whole.  '608 Patent at 3:42–53.

Also, although Claim 66 requires a card swipe (as recited in the claim from which Claim 66 depends, namely Claim 60), Claim 45 depends from Claim 34, and neither Claim 34 nor Claim 45 recites a card swipe.  SPG proposes (and Plaintiff previously proposed, as noted above) that "loyalty data" should be construed so as to include "data transmitted when a loyalty card is swiped," but SPG does not identify any definition or disclaimer in the intrinsic evidence regarding requiring a card swipe in the claimed invention as a whole.  Indeed, neither of the claims here at issue recites a loyalty card.  Instead, these claims recite an electronic gift certificate card (Claim 45) or a prepaid card (Claim 66).  Further, as the Third Party Defendants point out, *Green Dot* cited claim language reciting that a "loyalty card is swiped through the point-of-sale device."  *See Green Dot* at 15 (citing '608 Patent at Cl. 12) & 18 n.10 ("Each independent claim describing the process by which loyalty data is generated specifically states that the data is transmitted when the 'loyalty card is swiped through the point-of-sale device.'") (citing '608 Patent at Cls. 12, 20 & 29).  No such language appears in the claims here at issue in the present case, namely Claims 45 and 66, or the claims from which they depend.

Based on the foregoing, and based on the context provided by surrounding language in the claims at issue and the claims from which they depend, the Court rejects SPG's proposed construction and instead refers to data associated with card usage.

The Court therefore hereby construes **"loyalty data"** to mean **"data associated with card usage."**

### 3. "prepaid card"

| Plaintiff's Proposal | Defendant SPG | Third Party Defendants AmEx, Blackhawk, U.S. Bank |
|---|---|---|
| A card that requires a prepaid amount before it can be used | A card that requires a prepaid amount before it can be used in lieu of cash | A card that requires a prepaid amount before it can be used |

Dkt. No. 202, Ex. A at 3; Dkt. No. 232, Ex. A at A-3.  The parties submit that this term appears in Claims **60**, 65, and 66.  Dkt. No. 232, Ex. A at A-3; *see* Dkt. No. 202, Ex. A at 3 (independent claim bolded).

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that requires a prepaid amount before it can be used."

(a)  The Parties' Positions

Plaintiff urges the Court to adopt the *Datastream* and *IDT* construction for this term. Dkt. No. 212 at 17–18.  Plaintiff argues that SPG's proposal of "in lieu of cash" should be rejected because "the card could be used to pay for goods and services 'in lieu of' a number of other forms of payment than 'cash,'" such as traveler's checks or money orders.  *Id.* at 18 (citing '608 Patent at 7:61–62).

SPG responds that "the term 'prepaid card' is only used in the specification in connection with 'prepaid phone cards' and 'electronic gift certificate cards,'" "Alexsam's expert admitted that he had never seen any other value for an electronic gift certificate than in currency, and that prepaid phone cards are either measured in 'dollars' or minutes that are correlated to a dollar amount," and "SPG's proposed construction is consistent with the position taken by the applicant during prosecution of the '608 patent."  Dkt. No. 223 at 26–27.

24

Plaintiff replies that "SPG's citation to the prosecution history conflates an 'electronic gift certificate' with a 'prepaid card,'" and Plaintiff reiterates its arguments that the Court should adopt the *Datastream* construction.  Dkt. No. 228 at 8.

At the June 24, 2021 hearing, Plaintiff agreed with the Court's preliminary construction. SPG submitted that the only prepaid cards disclosed in the specification are electronic gift certificate cards.   Alternatively, SPG proposed replacing "in lieu of cash" with "in lieu of currency."

(b)  Analysis

*Datastream* construed "prepaid card" to mean "a card that requires a prepaid amount before it can be used."  *Datastream* at 13.  Plaintiff and the Third Party Defendants propose the *Datastream* construction.

Notwithstanding the statements by Plaintiff's expert cited by SPG (*see* Dkt. No. 223 at 26–27), and regardless of whether Plaintiff previously agreed with SPG's proposal (*see* Dkt. No. 61 at 2), SPG's proposal of "in lieu of cash" is inconsistent with the disclosed example of "a prepaid card substitute for travelers checks and money orders."  '608 Patent at 7:61–62.

 SPG also cites prosecution history in which the patentee stated as follows regarding the "Nguyen" reference cited by the examiner:

> [A]n *electronic gift certificate* is a card which can be used in lieu of cash to purchase items at one or more retailers.  Thus a gift certificate takes the place of money for use at a particular one or more retail locations. . . . Thus it is respectfully pointed out that the Nguyen reference, contrary to the Examiner's assertion, does not teach that a prepaid phone card used to make telephone calls may also function as an electronic gift certificate as presently claimed, but rather Nguyen merely teaches a prepaid phone card, good only for obtaining phone service, being given as a gift.  The distinction is not subtle, as the two items are completely different in functionality and result, since a prepaid phone card given to a person as a gift as taught by Nguyen is good only to obtain phone service and does not permit that person to go to a retailer and use that prepaid phone card to purchase goods in lieu of cash.

Dkt. No. 223, Ex. 1, June 24, 1999 Amendment at 17–18 (ALEXSM0000145–46) (emphasis added).  Of note, the parties have agreed to adopt the *DataStream* construction of "electronic gift certificate card" as meaning "a pre-paid card that operates through an exchange of electronic signals and that can be used in lieu of cash."  *DataStream* at 4; *see* App'x A (below).

This prosecution history refers to an "electronic gift certificate," not a "prepaid card." SPG does not show how the patentee's discussion of an "electronic gift certificate" can be applied to restrict the scope of the different term "prepaid card" so as to require SPG's proposed "in lieu of cash" limitation.  Disclosure cited by Defendant that "[p]repaid card systems are used by the telephone industry to allow customers to prepurchase long distance calling time," and that "such cards are typically purchased in predefined value increments," does not compel otherwise. '608 Patent at 1:36–40.

The Court therefore hereby construes **"prepaid card"** to mean **"a card that requires a prepaid amount before it can be used."**

4. "processing hub"

| Plaintiff's Proposal | Defendant SPG | Third Party Defendants AmEx, Blackhawk, U.S. Bank |
|---|---|---|
| A computer which provides front-end point-of-sale device management and message processing for card authorizations or activations; Not indefinite | This claim element is indefinite under § 112 because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.    To the extent that it can be understood: A computer which provides front-end point-of-sale device management and message processing for card authorizations or activations | A computer which provides front-end point-of-sale device management and message processing for card authorizations or activations. |

Dkt. No. 202, Ex. A at 3; Dkt. No. 212 at 18; Dkt. No. 232, Ex. A at A-4.  The parties submit that this term appears in Claims **34**, 37, 45, **60**, and 61.  Dkt. No. 202, Ex. A at 3 (independent claims bolded); Dkt. No. 232, Ex. A at A-4.

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations."

(a)  The Parties' Positions

Plaintiff submits that *Cigna* rejected an argument similar to SPG's indefiniteness argument.  Dkt. No. 212 at 19.  Plaintiff argues that "[v]iewed in light of the overall claim and specification, the term 'Processing Hub' informs those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* (citations omitted).  Plaintiff further argues that "[t]he term 'Processing Hub' has definite structure, and a POSITA would know from the specification how to program it," as well as "where a Processing Hub can be placed on a banking network[,] how transactions are initiated from a POS devices so that they can be received at a Processing Hub[,] how those transactions are routed through a transaction processor to a Processing Hub[,]

how the Processing Hub itself is configured[,] and what type of operations the Processing Hub performs." *Id.* at 20 (citations omitted).

SPG submits that "[n]either Alexsam nor its expert dispute that the term has no known meaning in the art and is functional." Dkt. No. 223 at 12. SPG argues that "claiming any and all solutions based on what the term does, rather than what it is, renders the term indefinite at the point of novelty." *Id.* at 11. SPG emphasizes that "the processing hub is 'new' and 'unconventional,' and the functions it must perform . . . are complex and vastly different." *Id.* at 15.

Plaintiff replies by reiterating that *Cigna* rejected an indefiniteness argument, and Plaintiff argues that "processing hub" "has definite structure." Dkt. No. 228 at 2–3. Plaintiff also argues: "[I]t is not the intent of the patentee to teach details of how a pre-paid phone card transaction is processed, or how a medical information card transaction is processed within the Processing Hub. The banking institutions and merchants that already performed these functions knew how to do so." *Id.* at 3–4.

At the June 24, 2021 hearing, Plaintiff agreed with the Court's preliminary construction. Plaintiff urged that the patent-in-suit does not purport to teach transaction processing but rather teaches a multifunction card that utilizes well-known transaction processing techniques in novel ways. SPG argued that whereas Plaintiff relies on disclosures regarding generic computer hardware and software, there is no disclosure of how to implement the claimed invention, and the patent uses functional claiming at the point of novelty.

(b)  Analysis

Claim 34, for example, recites (emphasis added):

34.  A system comprising:

28

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;

c. a *processing hub* receiving directly or indirectly said activation data from said transaction processor; and

d. said *processing hub* activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

Plaintiff submits that the "processing hub" is a non-conventional component of the claimed invention and thus has no well-established meaning in the relevant art.  The opinion of Plaintiff's expert, discussing the significance of various disclosures in the specification, is persuasive.  Dkt. No. 212, Ex. D, Sept. 18, 2020 Zatkovich Decl. at ¶ 34; *see, e.g.,* '608 Patent at 4:14–5:14, 10:65–11:37 & Fig. 2.  Such disclosures are sufficient from the perspective of a person of ordinary skill in the art, and "[t]he specification need not disclose what is well known in the art."  *See, e.g., In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991).

Much like the defendants in *Cigna*, SPG argues that the '608 Patent sets forth the "processing hub" in purely functional terms.  SPG submits:

Those functions include receiving merchant data, POS device data, and card, activation, transaction, and recharge data relating to the different types of cards, transmitting that data to various card issuer hubs after recognizing a card is associated with a particular issuer, accessing and/or operating loyalty, medical, and electronic gift certificate card databases based on the card function being used and transmitting that information to various parties, activating accounts corresponding to each different type of card with a balance corresponding to its activation amount, allowing a user to purchase a value up to the balance of that amount and approving or declining transactions, increasing the amount corresponding to a card when recharged, allowing the use of certain cards to obtain phone calling time, seizing accounts corresponding to certain cards as instructed by card issuer hubs, instructing card issuer hubs to seize records corresponding to certain cards when used, associating loyalty data with cards and

29

credit loyalty points to accounts based on card usage, and maintaining records of all transactions and allowing various parties to access those records.

Dkt. No. 223 at 12–13 (citations omitted).

On balance, SPG does not justify departing from the *Cigna* construction, which is SPG's alternative construction and which Plaintiff and the Third Party Defendants submit as their only proposals.  *See Cigna* at 45–49.  SPG's reliance on *Halliburton* and *Ariad*, for example, is unavailing here just as similar reliance on *Halliburton* and *Ariad* was unavailing in *Cigna*.  *See id.* at 47 & 49; *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (discussing the "vice of functional claiming" by using "conveniently functional language at the exact point of novelty"); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010) (improper to "recite a description of the problem to be solved while claiming all solutions to it").  The opinions of SPG's expert are likewise unpersuasive.  Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶¶ 30–35.

SPG also argues that "processing hub" is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function."  *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted).   "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment.   *Id.* (citation omitted).   *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted).  Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ."   *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)).   In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word."  792 F.3d at 1350.

Here, "processing hub" does not use any of the words identified by *Williamson* as a "nonce" word lacking structure, and the claim limitations at issue are not "in a format consistent with traditional means-plus-function claim limitations."  *Id.*   Moreover, above-reproduced Claim 34, for example, recites the "processing hub" receiving data from a "transaction

processor," and *Cigna* found that the term "transaction processor" refers to a well-known, conventional component.  *See Cigna* at 42–45; *see also Williamson*, 792 F.3d at 1351 (noting that the claim at issue "does not describe how the 'distributed learning control module' *interacts with other components* in the distributed learning control server in a way that might *inform the structural character* of the limitation-in-question or otherwise impart structure") (emphasis added).  The term "processing hub" is thus not merely function, and SPG's reliance on the *Pi-Net* case is unpersuasive.  *See Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, No. CV 12-282-SLR, 2014 WL 1997039, at *13 (D. Del. May 14, 2014) (Robinson, J.) (finding "computer system executing the back-end transactional application for processing the transaction request in real-time" to be governed by 35 U.S.C. § 112, ¶ 6, and indefinite for failing to provide an algorithm or "describe how requests are processed").  The *Markem-Imaje* case cited by SPG is likewise unpersuasive.  *See Markem-Imaje Corp. v. Zipher Ltd.*, No. 07-CV-00006-PB, 2012 WL 3263517, at *8 (D.N.H. Aug. 9, 2012) (Barbador, J.) ("one of ordinary skill in the art, confronted by the unbounded functional claiming at issue, would not apprehend what additional structure was being claimed to enable the controller to accomplish the recited functions").

The Court therefore hereby expressly rejects SPG's argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.

Finally, the *Aristocrat* case cited by SPG is unpersuasive because *Aristocrat*, as to principles regarding requirements for disclosure of program algorithms, applies only to means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.  *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333–34 (Fed. Cir. 2008).  SPG's reliance on the *Media Rights* case is unavailing for the same reason.  *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015).

The Court therefore adopts the *Cigna* construction and hereby construes **"processing hub"** to mean **"a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations."**

**5. "transaction processor"**

| Plaintiff's Proposal | Defendant SPG | Third Party Defendants AmEx, Blackhawk, U.S. Bank |
|---|---|---|
| A computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device; Not indefinite | This claim element is indefinite under § 112 because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.<br><br>To the extent that it can be understood, SPG agrees to adopt the prior construction of this term from the *DataStream* case:<br>　　A computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device | A computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device |

Dkt. No. 202, Ex. A at 4; Dkt. No. 212 at 21; Dkt. No. 232, Ex. A at A–6–A–7.  The parties submit that this term appears in Claims **34** and 44.  Dkt. No. 202, Ex. A at 4; Dkt. No. 232, Ex. A at A-6 (independent claim bolded).

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device."

(a)  The Parties' Positions

Plaintiff submits that *Cigna* rejected similar indefiniteness arguments.  Dkt. No. 212 at 21.  Plaintiff argues that "a 'transaction processor' is a recognized structure in the debit card industry."  *Id.* at 22; *see id.* at 25.  Plaintiff also argues that "[b]ecause the claim itself details the

objectives and operations of the transaction processor, it is not necessary to look to §112 ¶ 6 to interpret the claim." *Id.* at 23.  Plaintiff reiterates that "the 'transaction processor' connotes a well understood structure—a part of the multifunction system that facilitates debit card transactions —and is not intended to generically mean anything that receives and forwards data." *Id.* (citations omitted).  For example, Plaintiff argues that "[a] POSITA would simply look to the transaction processors existing in the industry and based on the claims and specification be able to program the transaction processor to route certain card transactions to a particular processing hub." *Id.* at 24 (citation omitted).  Plaintiff concludes that "[t]he only modification needed by this invention to existing transaction processors is to recognize specific BINs/card numbers, and when to route those transactions to a Processing Hub instead of directly to a payment network (Amex, Visa) or the issuing bank." *Id.* at 25 (citation omitted).

> SPG responds:
>
> Alexsam's entire argument that the term "transaction processor" is not indefinite rests on the irrelevant fact that normal, standard processors were known and understood.  However, Alexsam and its expert also repeatedly stated that the claimed transaction processor, its connections, and some of its operations are non-standard and part of the novelty of the invention.  Functionally claiming any and all solutions at a point of novelty without even mentioning or discussing the term in the specification, as done here, renders the term indefinite under any standard.

Dkt. No. 223 at 4; *see id.* at 5–7.  SPG also argues: "SPG does not dispute that in many cases the term 'transaction processor' connotes a known structure, as set forth in Alexsam's case law and acknowledged by SPG's expert (Dkt. 212-7 at ¶ 28).  However, the term 'transaction processor' *as used in the '608 Patent*, and by Alexsam's and its expert's own admissions, does not."  Dkt. No. 223 at 8.  SPG further notes, as to the processors disclosed in the specification, cited by Plaintiff ("sponsor bank processor 102," a "bank processor" 208 or 209, and a retailer's "central processor" 201, 202, or 203), "[n]one of the different disclosed processors is referred to as the

'transaction processor' or as being able to process all of the nonstandard card types and data types as claimed." *Id.* at 9.

Plaintiff replies that "AlexSam acknowledges that a transaction processor was an existing component within the banking and payment industry used by merchants prior to, and after, the invention." Dkt. No. 228 at 1.  Plaintiff submits that "the '608 Patent extended the functionality of the transaction processor, and the combination of a transaction processor with the Processing Hub was a novel aspect," and "[w]ithin the '608 Patent, the operation of the transaction processor remains the same, except for the addition of routing information for the BINs of the multifunction cards." *Id.*

At the June 24, 2021 hearing, Plaintiff agreed with the Court's preliminary construction. SPG submitted that the term "transaction processor" appears only in the claims and not in the specification, and SPG reiterated its arguments that the term is unclear.

(b)  Analysis

Claims 34 and 44, for example, recite (emphasis added):

34.  A system comprising:
        a.  at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;
        b.  a *transaction processor* receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;
        c.  a processing hub receiving directly or indirectly said activation data from said *transaction processor*; and
        d.  said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

* * *

35

44.  The system of claim 34, wherein the transaction processor is coupled to the banking network.

Plaintiff submits:

> In Figure 2 all of the "Retail Central Processors" (blocks 201, 202, 203) are operated as transaction processors by merchants; whereas all of the "Bank Processors" (blocks 102, 208, 209) are operated as transaction processors by banks.  For example, the specification describes how the transaction processor (e.g. the "bank processor 208") "receives the data and transmits it over the debit network 107.  The debit network 107 then forwards the data to the Sponsoring bank's processor 102." ['608 Patent] at 6:17–19.

Dkt. No. 212 at 24.

Plaintiff's expert likewise submits that transaction processors are well known in the relevant art as structures that "route standard debit and credit card transactions from the POS devices to/from merchant banks and issuing banks through a banking network."  *Id.*, Ex. D, Sept. 18, 2020 Zatkovich Decl. at ¶ 12; *see id.* at ¶¶ 13–16; *see also id.* at ¶ 21 ("The only modification needed by this invention to existing transaction processors is to recognize specific BINs/card numbers, and when to route those transactions to a Processing Hub instead of directly to a payment network (Amex, Visa) or the issuing bank.")

The statement of Plaintiff's expert, cited by SPG, that "the term transaction processor is functionally claimed" (Dkt. 212, Ex. C, July 31, 2020 Zatkovich Decl. at ¶ 43) does not render the claim indefinite or require application of 35 U.S.C. § 112, ¶ 6.

Similar to the discussion above regarding the term "processing hub," SPG's reliance on *Halliburton*, *Ariad*, and additional authorities is unavailing.  *See Cigna* at 47 & 49; *see also Halliburton*, 514 F.3d at 1255 (discussing the "vice of functional claiming" by using "conveniently functional language at the exact point of novelty"); *Ariad*, 598 F.3d at 1353 (improper to "recite a description of the problem to be solved while claiming all solutions to it"); *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306–07 (Fed. Cir. 2017) ("[F]unctional

limitations . . . cannot be 'so broad that [they] cause[] the claim to have a potential scope of protection beyond that which is justified by the specification disclosure.'"); *Markem-Imaje*, 2012 WL 3263517, at *8 (finding claims invalid as indefinite under 35 U.S.C. § 112, ¶ 2 because "one of ordinary skill in the art, confronted by the unbounded functional claiming at issue, would not apprehend what additional structure was being claimed to enable the controller to accomplish the recited functions"). The opinions of SPG's expert are likewise unpersuasive. *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶¶ 23–28.

SPG also argues that "processing hub" is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth in the discussion of the term "processing hub," above.

Here, "transaction processor" does not use any of the words identified by *Williamson* as a "nonce" word lacking structure. *See* 792 F.3d at 1350. The word "processor" connotes structure. *Cf. Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020) (rejecting finding that 35 U.S.C. § 112, ¶ 6 applied to the term "digital processing unit," noting that "the term 'digital processing unit' clearly serves as a stand-in for a 'general purpose computer' or a 'central processing unit,' each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function"); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-CV-5808, 2015 WL 7770208, at *10–*11 (N.D. Cal. Dec. 3, 2015) (Gilliam, J.) ("content processor" had specific structure because the claim described interaction with the transmitter and receiver, and because the specification identified the component's location).

This finding is consistent with principles articulated by the Federal Circuit after *Williamson* as well as prior to the abrogated *Lighting World* decision. *See Greenberg v. Ethicon*

*Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because "'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms"; "It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.'  What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art."); *see also Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019–21 (Fed. Cir. 2017) (finding "wireless device means" not a means-plus-function term, noting that "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function") (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)); *cf. Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320–21 (Fed. Cir. 2004) (finding that "circuit" terms connoted structure).

Moreover, Plaintiff asserts, and *Cigna* found, that the term "transaction processor" refers to a well-known, conventional component.  *See Cigna* at 42–45; *see also* '608 Patent at 6:15–31, 6:46–47, 7:62–64 & Fig. 2.  The opinions of Plaintiff's expert are further persuasive in this regard.  *See* Dkt. No. 212, Ex. D, Sept. 18, 2020 Zatkovich Supplemental Decl. at ¶ 12 ("A transaction processor has been implemented by both retail merchants and bank processors for many years."); *see also id.* at ¶ 19 ("The novelty that this invention brings for multifunction cards is how it combines a transaction processor with a new component of this invention, a Processing Hub."); *id.* at ¶¶ 11–22.

The various additional cases cited by SPG relate to the particular claim terms there at issue and are not persuasive as to the present dispute. *See Checkpoint Sys., Inc. v. Hangzhou Century Co.*, No. 5:11-CV-1199, 2014 WL 4930686, at *6 (N.D. Ohio Oct. 1, 2014) (claims indefinite as "first structure" was not in the specification so "a person of ordinary skill in the art would have no way to know which elements constitute the 'first structure'"); *see also Image Processing Techs., LLC v. Samsung Elecs. Co.*, No. 2:16-CV-505, 2017 WL 2672616, at *32 (E.D. Tex. June 21, 2017) ("boundary" indefinite when "it is unclear which of the referenced four boundaries of the target is referred to"); *Abdou v. Alphatec Spine, Inc.*, No. 12-CV-1804-BEN (RBB), 2014 WL 6611422, at *9–*10 (S.D. Cal. Nov. 19, 2014) ("surface" was indefinite where there was no indication which surface was the claimed one); *Ethicon LLC v. Intuitive Surgical, Inc.*, No. CV 17-871-LPS, 2018 WL 6831169, at *11 (D. Del. Dec. 28, 2018) ("actuator arrangement" indefinite when there were "many structures that connect to the housing and actuate something"); *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, No. CV 12-282-SLR, 2014 WL 1997039, at *13 (D. Del. May 14, 2014) (finding "computer system executing the back-end transactional application for processing the transaction request in real-time" to be governed by 35 U.S.C. § 112, ¶ 6, and indefinite for failing to provide an algorithm or "describe how requests are processed").

The Court therefore hereby expressly rejects SPG's argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.

Further, the *Aristocrat* case cited by SPG is unpersuasive because *Aristocrat*, as to principles regarding requirements for disclosure of program algorithms, applies only to means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. *See* 521 F.3d at 1333–34. SPG's reliance on the *Media Rights* case is unavailing for the same reason. *See Media Rights*, 800 F.3d at 1374.

Finally, although SPG's arguments and its expert's opinions regarding sufficiency of disclosure may perhaps bear upon other issues, such as enablement or written description, SPG's arguments do not demonstrate indefiniteness.  *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶¶ 24–28.

On balance, SPG does not justify departing from the *Cigna* construction, which is SPG's alternative construction and which Plaintiff and the Third Party Defendants submit as their only proposals.  *See Cigna* at 42–45; *see also* Dkt. No. 223 at 4 ("To the extent the claimed 'transaction processor' is not a novel or inventive aspect of the invention and is merely a normal, standard transaction processor, SPG agrees that it should be construed as 'a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device.'") (citing Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 28).

The Court therefore hereby adopts the *Cigna* construction and construes **"transaction processor"** to mean **"a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device."**

### 6.  Mixed Method-Apparatus

The dispute as to whether Claims 35, 36, and 39 of the '608 Patent are invalid as improper mixed method-apparatus claims does not appear in the pre-briefing claim term chart filed by the parties pursuant to P.R. 4-3 (*see* Dkt. No. 202, Ex. A), but this dispute is addressed in the parties' briefing and does appear in the post-briefing claim term chart filed by the parties pursuant to P.R. 4-5(d).  Dkt. No. 232, Ex. A at A-7–A-8.

Shortly before the start of the June 24, 2021 hearing, the Court provided the parties with the following preliminary construction: "Not indefinite."

<u>(a)  The Parties' Positions</u>

SPG argues that Claim 36 of the '608 Patent is an improper mixed method-apparatus claim, and is therefore invalid, because:

> Given that it requires human action, a POSITA would not know when infringement occurs, i.e., whether claim 36 covers a system where the activation amount is capable of being entered at the POS device[fn] or a system wherein the activation amount actually "is entered" at the POS device.

> [fn:] To the extent Alexsam tries to argue that this requirement for human action is merely a capability of the POS device, that argument fails because (1) it is not, and (2) the POS device is not a *claimed* component of the system of claim 34, which claims the card, transaction processor, and processing hub.

Dkt. No. 223 at 29 (citations omitted).  SPG also argues that "Claim 35 is similar to claim 36 except that rather than requiring clear human action, it requires that some unidentified device, component, or entity encode the activation amount in the unique identification number."  *Id.* Finally, as to Claim 39, SPG argues that "a POSITA would not know with reasonable certainty whether infringement occurs when a system simply exists that somehow allows the first digit of the BIN to be selected as claimed or is able to be used with cards that have the first digit of the

BIN selected as claimed, or when the first digit of the BIN actually 'is selected' from the claimed group of numbers by some unidentified person, entity, or device."  *Id.* at 30.

Plaintiff replies that "a complete examination demonstrates that dependent claims 35, 36 and 39 each describes the capabilities of Claim 34's system, not a user's actions."  Dkt. No. 228 at 9.

At the June 24, 2021 hearing, SPG reiterated the indefiniteness arguments set forth in its briefing.

(b)  Analysis

A single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class.  *IPXL Holdings*[*, LLC v. Amazon.com, Inc.*], 430 F.3d [1377,] 1384 [(Fed. Cir. 2005)] (holding indefinite a claim covering both an apparatus and a method of using that apparatus).

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008); *see H-W Tech, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014) (finding claim indefinite because "it is unclear when infringement occurs").

Claims 35, 36, and 39 depend from Claim 34.  Claims 34, 35, 36, and 39 recite (emphasis added):

34.  A system comprising:
    a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;
    b. a transaction processor receiving electronic gift card activation data from *an unmodified existing standard retail point-of-sale device*, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;
    c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d.  said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

35.  The system of claim 34, wherein the electronic gift certificate card activation amount *is encoded* in the unique identification number.

36.  The system of claim 34, wherein the electronic gift certificate card activation amount *is entered at the point-of-sale device*.

* * *

39.  The system of claim 34, wherein the first digit of the bank identification number *is selected* from a group of numbers consisting of the numbers four and five.

As to Claim 35, SPG argues: "Given that the limitation of actually encoding is not tied to a specific component in the claim, a POSITA would not know whether infringement of claim 35 occurs when a system merely exists that is able to be used with cards that have the activation amount encoded in the identification number or that at some time allows the activation amount to be encoded, or when the activation amount actually 'is encoded' in the identification number by some unclaimed, unspecified system, component, or entity."  Dkt. No. 223 at 30 (citing *id.*, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 60).

Contrary to SPG's arguments, Claim 35 does not "recite[] both apparatus elements and a method element that was performed by the apparatus (though not tied to a recited structure)." *Power Integrations, Inc. v. ON Semiconductor Corp.*, No. 16-CV-06371-BLF, 2018 WL 5603631, at *16–*17 (N.D. Cal. Oct. 26, 2018) (Freeman, J.) (discussing *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011)).  Instead, dependent Claim 35 recites a further limitation regarding a property of the electronic gift certificate card.  This is particularly apparent in light of the recital in independent Claim 34 of (emphasis added): "at least one electronic gift certificate card having an electronic gift certificate card unique identification

number *encoded* on it."  The *Power Integrations* case cited by SPG is therefore unpersuasive.  *See id.*[6]  The claim language at issue does not give rise to an improper mixed method-apparatus claim.  The opinion of SPG's expert to the contrary is unpersuasive.  *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 60.

As to Claim 36, SPG argues that "[g]iven that it requires human action, a POSITA would not know when infringement occurs, i.e., whether claim 36 covers a system where the activation amount is capable of being entered at the POS device or a system wherein the activation amount actually 'is entered' at the POS device."  Dkt. No. 223 at 29 (footnote omitted) (citing *id.*, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 61).  SPG also notes that "the POS device is not a claimed component of the system of claim 34, which claims the card, transaction processor, and processing hub."  Dkt. No. 223 at 29 n.7.

Yet, Claim 34 (from which Claim 36 depends) does indeed recite "an unmodified existing standard retail point-of-sale device" as part of the system.  Also, Claim 36 recites not "entering" but rather "is entered," which can be fairly read in conjunction with independent Claim 34 as referring to an aspect of the configuration of the recited point-of-sale device.  The *Katz* case cited by SPG is therefore distinguishable.  *See In re Katz*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) ("the language used in Katz's claims ('wherein . . . callers digitally enter data' and 'wherein . . . callers provide . . . data') is directed to user actions, not system capabilities").[7]

---

[6] The *Ariba* case cited by SPG is likewise unpersuasive.  *Ariba, Inc. v. Emptoris, Inc.*, No. CIV.A. 9:07-CV-90, 2008 WL 3482521, at *7 (E.D. Tex. Aug. 7, 2008) (Clark, J.), *aff'd*, No. 2009-1230, 2010 WL 55625 (Fed. Cir. Jan. 8, 2010).

[7] The *Aventis*, *Visible Connections*, and *Barkan Wireless* cases cited by SPG do not compel otherwise.  Those decisions turned on the particular claim language at issue in those cases, wherein the context of such language connoted action rather than merely system configuration.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 329–30 (D. Del. 2010) (Sleet, J.) ("said therapeutic composition forms or is used to form an injectable solution"); *see also Visible Connections, LLC v. Zoho Corp.*, 418 F. Supp. 3d 155, 166 (W.D. Tex. 2019) (Pitman, J.)

Finally, SPG cites disclosure in the specification that a clerk can swipe a card and enter a transaction amount ('608 Patent at 7:44–47), but this is merely consistent with Claim 36 reciting configuration of the point-of-sale device recited in Claim 34.   SPG thus fails to demonstrate invalidity as to Claim 36.   The claim language at issue does not give rise to an improper mixed method-apparatus claim.   The opinion of SPG's expert to the contrary is unpersuasive.   *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 61.

As to Claim 39, SPG argues that "a POSITA would not know with reasonable certainty whether infringement occurs when a system simply exists that somehow allows the first digit of the BIN to be selected as claimed or is able to be used with cards that have the first digit of the BIN selected as claimed, or when the first digit of the BIN actually 'is selected' from the claimed group of numbers by some unidentified person, entity, or device."   Dkt. No. 223 at 30 (citing *id.*, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 62).

Substantially the same analysis applies to Claim 39 as set forth above for Claim 35.   That is, dependent Claim 39 recites a further limitation regarding a property of the electronic gift certificate card.   *See, e.g.,* '608 Patent at 4:47–65 ("a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers").   This does not give rise to an improper mixed method-apparatus claim.   The opinion of SPG's expert to the contrary is unpersuasive.   *See* Dkt. No. 212, Ex. F, Sept. 18, 2020 Mott Decl. at ¶ 62.

---

(system claims reciting "wherein the host user [] selects"); *Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, No. 2:18-CV-28-JRG, 2019 WL 497902, at *33 (E.D. Tex. Feb. 7, 2019) (Payne, J.) (finding that "wherein the add-on base station is owned and installed by an individual or entity" did "not recite a mere capability" but rather was "action language" that made it "unclear whether infringement of the claim occurs when one creates a system that allows the user to own and install the add-on base station, or whether infringement occurs when the user actually owns and installs the add-on base station") (citation, alterations, and internal quotations omitted).

**The Court therefore hereby expressly rejects Defendant's mixed-method-apparatus indefiniteness arguments as to Claims 35, 36, and 39**, and no further construction is necessary in this regard.

## V.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 4th day of August, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Parties' Agreement |
|---|---|
| 1. "activating an account"<br><br>(Claims **34**,[8] 60) | Making an account functional for use |
| 2. "activation amount"<br><br>(Claims **34**, 35, 36, 37, **60**, 62, 63) | A value used to establish the total value of goods or services that the user may obtain upon the prepaid account being made functional for use |
| 3. "activation data"<br><br>(Claim **34**) | Plain and ordinary meaning |
| 4. "balance corresponding to the electronic gift certificate activation amount"<br><br>(Claims **34**, 37) | Plain and ordinary meaning |
| 5. "bank identification number approved by the American Banking Association for use in a banking network"<br><br>(Claims **34**, 39, **60**) | A numeric code which identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association |
| 6. "corresponding to"<br><br>(Claims **34**, 37, **60**) | Plain and ordinary meaning |
| 7. "coupled"<br><br>(Claim 44) | Plain and ordinary meaning |
| 8. "electronic gift certificate card"<br><br>(Claims **34**, 35, 36, 37, 44, 45) | A pre-paid card that operates through an exchange of electronic signals and that can be used in lieu of cash |

---

[8] Bold indicates independent claims.

| | |
|---|---|
| 9.   "electronic gift certificate card activation amount is encoded in the unique identification number"<br><br>(Claim 35) | Plain and ordinary meaning |
| 10. "encoded"<br><br>(Claims **34**, 35, **60**) | Plain and ordinary meaning |
| 11. "entering"<br><br>(Claim 62) | Plain and ordinary meaning |
| 12.  "associates loyalty data with the electronic gift certificate card based upon usage"<br><br>(Claim 45) | Plain and ordinary meaning |
| 13.  "receiving directly or indirectly"<br><br>(Claim **34**) | Plain and ordinary meaning |
| 14.  "recharge/recharging"<br><br>(Claim 61) | Purchase value for a previously activated card |
| 15. "swiping the card" and "swiping"<br><br>(Claim **60**) | Passing or sliding a card through an electronic card reader |
| 16. "transmitting"<br><br>(Claims **60**, 63) | Plain and ordinary meaning |
| 17. "unique identification number"<br><br>(Claims **34**, 35, **60**, 61, 63) | Plain and ordinary meaning |
| 18.   "Unmodified Existing Standard Point-of-Sale Device"<br><br>(Claim **60**) | A terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. |

| 19. "Unmodified Existing Standard Retail Point-of-Sale Device"<br><br>(Claim **34**) | A terminal, for making purchases at a retail location, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. |
| --- | --- |

Dkt. No. 202 at 3–4; Dkt. No. 232, Ex. A at A-8–A-12.